**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stacia C. Hill, | No. CV-13-02315-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Plaintiff Stacia C. Hill asserts claims against the City of Phoenix, its Police Department, and the Department's Chief (collectively, "the City") for unlawful termination and failure to engage in the interactive process in good faith in violation of the Americans with Disabilities Act ("ADA"). Doc. 1. The parties have filed cross-motions for summary judgment. Docs. 67, 69. The motions have been fully briefed (Docs. 75, 78), and the Court held oral argument on January 19, 2016. For the reasons that follow, Hill's motion will be denied, and the City's motion will be granted in part.[1]

**I.  Background.**

Stacia C. Hill was employed by the City of Phoenix Police Department from 1991 to 2012. Docs. 68 & 70, ¶¶ 9, 184. In 2003, Hill began suffering ankle problems and shift work sleep disorder. *Id.*, ¶ 13. In May 2010, she took medical leave after reinjuring

---

[1] The Court's Case Management Order provides that statements of fact in support of motions for summary judgment shall not exceed 10 pages. Doc. 36, ¶ 7(d). The City disregarded this requirement (Doc. 68), forcing Plaintiff to do the same (Doc. 70). Counsel shall comply with court orders in the future.

1   her ankle.  *Id.*, ¶ 38.  She returned to work on February 27, 2012, after approximately 21
2   months of leave.  *Id.*, ¶ 1.

3       Upon returning to work, Hill advised the City of her ankle problems and sleep
4   disorder.  *Id.*, ¶ 2.  The City contends that it accommodated these disabilities by assigning
5   Hill to the Front Desk Sergeant position, which it characterizes as a sedentary desk job,
6   and by giving Hill an 8:00 a.m. to 4:00 p.m. shift, consistent with the recommendations
7   of her sleep doctor, Dr. Stephen Anthony.  Doc. 68, ¶¶ 46-54, 258.  Hill disputes whether
8   the Front Desk Sergeant was in fact a sedentary position – she contends she was on her
9   feet 95% of the time – but she does not dispute that her hours were consistent with Dr.
10  Anthony's orders.  Doc. 70, ¶¶ 52, 257, 276.

11      By mid-April 2012, Hill began arriving late and missing some days of work.
12  Docs. 68 & 70, ¶ 4.  Hill states that she began experiencing increased ankle pain around
13  this time because she was spending too much time on her feet.  Doc. 70, ¶ 276.  The
14  parties dispute whether Hill raised these concerns with her supervisor, Lieutenant
15  Anthony Lopez.  According to Hill, she told Lopez about her concerns sometime in
16  April.  Doc. 70-2 at 4-6.  According to Lopez, he "never saw [Hill] limping" and was
17  "never aware that she felt she was spending too much time on her feet."  Doc. 76, Ex. 56,
18  ¶ 46.  It is undisputed, however, that Hill complained about her ankle condition in an
19  April meeting with Mary Lynne MeKenney, the City's long term disability ("LTD")
20  coordinator.  Doc. 70-1 at 6-7.  MeKenney advised Hill that she should approach Judy
21  Boros, an employee in Human Resources, about obtaining additional accommodations.
22  *Id.* at 6.  Hill testified that she tried to contact Boros, but Boros never responded.  *Id.*

23      Also in mid-April, Hill began supplementing her work as Front Desk Sergeant
24  with work at the Off Duty Detail position.  Docs. 68 & 70, ¶ 74.  The latter position
25  involved scheduling and managing off-duty projects undertaken by the Department's
26  officers.  *Id.*, ¶¶ 75-76.  At some point after taking on this additional position, Hill told
27  Lopez that she needed an additional officer to help with the increased volume of work
28  from both positions.  *Id.*, ¶ 77.

1  Hill's attendance problems worsened in May. After taking two vacation days to study for exams (Hill was pursuing a master's degree), she requested to have May 7th and 8th off. Docs. 68 & 70, ¶¶ 79-81. Hill's request was granted, and she decided to take a half-day off on the 9th as well. *Id.*, ¶¶ 81-82. On May 11th, Hill sent a text message to Lieutenant Lopez indicating that she was experiencing side effects from her sleep medicine and was not feeling well enough to work. *Id.*, ¶¶ 85-86. Hill was absent again on the 14th. *Id.*, ¶¶ 87-88. On the 15th, Hill was an hour late and asked for permission to flex her hours by working from 9:00 am to 5:00 pm. *Id.*, ¶¶ 89-90. When Lopez denied the request, Hill left at her normal time and used an hour of vacation time. *Id.*, ¶ 93. Hill also missed the 16th and part of the 18th. *Id.*, ¶¶ 98-99, 102-03. On the 18th, Hill obtained a note from Dr. Anthony indicating that she would "have trouble making it to work on time, occasionally," and "would have days where she would miss work entirely." Doc. 68, Ex. 17.[2]

On May 21, 2012, Lieutenant Lopez held a "coaching session" with Hill. Lopez told Hill that he would be removing her from the Off Duty Detail position in order to lighten her workload. *Id.*, Ex. 54 at 9. Hill stated that she viewed this decision as "punishment" for her previous use of approved leave. *Id.* She also stated: "I believe that I can do both [positions] very well as long as I'm doing supervisory work and not officer work." *Id.* Hill did not indicate that she viewed the Off Duty Detail position as a better accommodation for her disabilities. *See id.* Nor did she raise concerns about being on her feet at any time during the meeting, which lasted approximately 100 minutes. *See id.*, Ex. 54. Hill did request the option to work four ten-hour days per week (i.e., "4/10s") and suggested that Lopez's recent denial of her request to flex her hours may have violated the ADA. Docs. 70-2 at 30; 68, Ex. 54 at 6-7.

---

[2] As with all of the doctors' notes discussed here, Dr. Anthony's May 18th note offered to answer any questions the City might have about Hill's condition.

- 3 -

Following this meeting, Lopez scheduled a May 31, 2012 appointment for Hill to meet with Judy Boros and another employee from the City's Equal Opportunity Department. *Id.*, Ex. 1 at 3. But Hill stopped reporting to work entirely on May 22 and as a result did not attend the meeting. Docs. 68 & 70, ¶¶ 113, 117-19. Hill testified at her deposition that she did not learn of the meeting until after it occurred. Doc. 68, Ex. 43 at 234-35; *see also* Doc. 71-1, Ex. 2, ¶ 21 (Hill's affidavit).

On May 23, 2012, Hill's psychologist, Dr. Stephen Carson, drafted a two-sentence letter recommending that Hill "be placed on stress leave beginning on May 22, 2012 for an indeterminable amount of time." Doc. 68, Ex. 2. Hill provided this letter to the City on May 30th. Docs. 68 & 70, ¶ 120. On May 31, the City sent a letter to Hill explaining that the Carson letter was insufficient to authorize Hill's absence because it "failed to identify a medical condition or provide any information as to the nature of the condition, prognosis, course of treatment, symptoms, duration of the condition, or an anticipated date of return to work." Doc. 68, Ex. 19. The letter requested additional information explaining why Hill was unable to work. *Id.* The letter further stated that unless Hill supplied such information, her failure to report to work on June 4, 2012 might be classified as job abandonment. *Id.* Later that day, the City sent Hill another letter extending the deadline to report until June 6. *Id.*, Ex. 7. Around the same, the City sent Hill a letter advising her that her position required her to maintain regular and reliable attendance. *Id.*, Ex. 3.

Hill did not report to work on June 6, 2012. *Id.*, ¶ 129. On June 4, Dr. Carson provided the City with a letter explaining that Hill was experiencing "considerable anxiety" which had exacerbated her sleeping difficulties and depression. Doc. 68, Ex. 21. He recommended that Hill not drive a vehicle, and indicated that it was "difficult [to] pinpoint when she will be able to return to duty, if ever." *Id.* On June 6, Dr. Anthony provided the City with a letter stating that it was "difficult to say when exactly Ms. Hill can return to work," but that it would likely be possible once her stress levels improved. *Id.*, Ex. 22.

- 4 -

1    On June 26, 2012, the City sent Hill a letter requesting that she have her doctors
2 complete a "reasonable accommodation medical questionnaire" to "clarify [her] medical
3 conditions." *Id.*, Ex. 8.  The letter also informed Hill that she had exhausted her leave
4 time and would need to request a leave of absence if she wished to remain employed. *Id.*
5 Failure to obtain such leave, the letter warned, would constitute job abandonment. *Id.*

6    Also on June 26, 2012, Hill was examined by Dr. David Lee, a podiatrist, who
7 completed a LTD form at her request. *Id.*, Ex. 24.  Dr. Lee indicated that Hill was able to
8 work eight hours a day at "a desk position [with] walking limited to personal travel." *Id.*
9 The next day, Dr. Carson wrote a letter clearing Hill to return to work and recommending
10 that she be allowed to work 4/10s so that she could attend medical appointments on her
11 day off. *Id.*, Ex. 26.

12    Hill returned to work on June 28, 2012,   Docs. 68 & 70, ¶ 151.  Lopez was not
13 working that week, and Hill's interim supervisor allowed her to work 4/10s pending
14 resolution of the issue. *Id.*, ¶ 148.  When Lopez returned, he informed Hill that she
15 would not be permitted to work 4/10s going forward. *Id.*, ¶¶ 158-59.  Hill began using
16 unscheduled leave again on July 10th, leaving two hours early on that day, and failing to
17 report on the 11th or 12th. *Id.*, ¶ 164-69.  On July 13, Hill came to work but left two
18 hours early, complaining about her ankle. *Id.*, ¶ 172.  She never returned to work again.
19 *Id.*, ¶ 173.

20    On July 17, 2015, Dr. Carson produced a two-sentence letter virtually identical to
21 the one supplied on May 23rd, again recommending Hill be placed on "stress leave" for
22 an "indeterminable amount of time." *Id.*, Ex. 30.  On July 25, the City sent Hill a letter
23 advising her that Dr. Carson's letter was not sufficient to authorize her absence, and
24 requesting that she provide acceptable documentation of her medical condition and
25 contact her supervisor immediately regarding her intentions to return to work. *Id.*, Ex. 4.
26 The letter further informed Hill that failure to report to work by July 27, 2012 would be
27 classified as job abandonment. *Id.*  On July 25, Hill provided the City with a new letter
28 from Dr. Carson which contained identical wording to the June 4 letter (i.e., that Hill was

suffering from stress, depression, and sleep issues, and it was "difficult [to] pinpoint when she will be able to return to duty, if ever"). *Id.*, Ex. 32.

On July 30, 2012, the City sent Hill a letter stating that because she had not reported to work or provided acceptable medical documentation, the Department would classify her as having abandoned her job. *Id.*, Ex. 5. The letter further informed Hill that the City would consider reinstating her if she could establish that her absence was due to circumstances beyond her control. *Id.*

On August 7, Hill sent a letter to the Department's Chief which stated:

> I wish to inform you that I was absent from my job only because I was instructed not to work by my doctors. If I were able to perform my job, I would be there and I'm certain the City does not want me at work if I'm unable to perform my duties. . . . I request you reinstate me and allow me to remain on unpaid leave until I can complete the LTD application process.

*Id.*, Ex. 33. This request was denied. *Id.*, Ex. 34.

## II. Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III. Analysis.

Hill asserts that the City violated the ADA by terminating her because of her disability in July 2012, and by failing to engage in the interactive process in good faith in May and June 2012.

#### A. Unlawful Termination.

To establish a prima facie case for unlawful termination in violation of the ADA, Hill must show that "(1) she is disabled within the meaning of the ADA; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (citation omitted); 42 U.S.C. § 12112(a), (b)(5)(A). The City does not dispute that Hill is disabled within the meaning of the ADA. Instead, it argues that (1) Hill was not a qualified individual at the time of her termination because she could not perform the essential functions of her job even with reasonable accommodation (Doc. 67 at 10-11), and (2) Hill was not terminated because she was disabled, but because she was absent without authorized leave for more than one work week in violation of Department policy (*id.* at 19-20).

A qualified individual is someone who, "with or without reasonable accommodation," "can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). In determining whether an individual is qualified, "the court first examines whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the position," and then considers "whether the individual can perform the essential functions . . . with or without a reasonable accommodation." *Samper*, 675 F.3d at 1237 (quoting *Bates v. United Parcel Svc., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (en banc)). Although the plaintiff bears the burden of proof on this element, the defendant "has the burden of production in establishing what job functions are essential." *Id.* (citing *Bates*, 511 F.3d at 991). To carry this burden, the defendant "must clearly set forth, through the introduction of admissible evidence,

reasons for its actions which, if believed by the trier of fact, would support a finding" that the function in question was essential to the employment position. *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

The City contends that regular and reliable attendance was an essential function of the Front Desk Sergeant position, and that Hill was unable to maintain such attendance at the time of her termination, even with reasonable accommodation. Doc. 67 at 10. In support, the City cites *Samper v. Providence St. Vincent Medical Center* for the "rather common-sense idea . . . that if one is not able to be at work, one cannot be a qualified individual." 675 F.3d at 1237 (citation omitted). The City also points to a job description published on its website the month before Hill's termination, which states that police sergeants are required to supervise sworn and non-sworn police staff, to call roll at the beginning of a shift, to "inspect Police officers for appearance, readiness, and preparation for duty," to "brief employees on special tasks or assignments," and to "conduct or provide for training." Doc. 75 at 4 (citing Doc. 68, Ex. 8).[3]

Hill advances three counterarguments. First, she points to the fact that the Front Desk Sergeant position had been vacant for two years when the City assigned her to that position as evidence that her attendance was "unimportan[t]." Doc. 69 at 8. Second, she asserts that the City has not identified any safety or security compromises caused by her absence. *Id.* Finally, she cites *Humphrey v. Memorial Hospital Association*, 239 F.3d 1128 (9th Cir. 2001), for the proposition that an employee may be a qualified individual despite her inability to maintain regular attendance if she is able to work from home.

As the Ninth Circuit explained in *Samper*, regular and reliable attendance may be an essential function where the job requires the employee to work "as part of a team," in "face-to-face interaction with clients and other employees," or "with items and equipment

---

[3] The City also cites a local regulation providing that its employees are expected to minimize the number of times they are absent from work and to refrain from excessive unscheduled absences. Doc. 67 at 10 (citing City of Phoenix, Administrative Regulation 2.30, City Leave Policies (effective July 1, 2014)). Hill objects to the relevance of this regulation, which postdates her termination by more than two years. Doc. 69 at 8 n.1. The Court will not consider the regulation in this ruling.

- 8 -

that are on site." 675 F.3d at 1237 (citations omitted). Regular attendance is not an essential function where the job "can be performed off site or deferred until a later day." *Id.* at 1239 (citation omitted). The Ninth Circuit characterized *Humphrey* – a case involving a medical transcriptionist who sought to work from home and provided evidence that other transcriptionists were allowed to do so – as an exception to the general rule. *Id.* (citing 239 F.3d at 1139). In sum, "[e]xcept in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work" is not a qualified individual within the meaning of the ADA. *Id.* (citation omitted).

The City has established that the Front Desk Sergeant position was not the type of job that Hill could perform effectively from home. The City points to a written job description that contemplates that police sergeants will be physically present in the workplace. *See* Doc. 68, Ex. 8.[4] It also presents evidence that Hill was expected to supervise other employees (*id.*), a function she could not effectively discharge without engaging in face-to-face interaction with her subordinates. *See also* Docs. 68 & 70, ¶ 50 (Front Desk Sergeant expected "to greet visitors and handle a variety of other tasks associated with ensuring the safety of the police headquarters."). Finally, the City has produced evidence Hill was informed in late May 2012 that she was "expected to demonstrate regular and reliable attendance." Doc. 68, Ex. 3. This undisputed evidence is sufficient to establish the City's entitlement to summary judgment on this issue. *See Samper*, 675 F.3d at 1238 (defendant was entitled to summary judgment on "essential function" question where written job description indicated that regular attendance was required); *id.* at 1237 (regular attendance may be an essential function where position requires "face-to-face interaction with clients and other employees.").

---

[4] Hill objects that this job description does not, in so many words, list full-time attendance as an essential function of the sergeant position. Doc. 69 at 8. But she does not explain how she could have called roll, inspected officers, or provided briefing and training without being physically present in the workplace.

- 9 -

Hill's argument based on the prior vacancy of the Front Desk Sergeant position confuses the question of whether attendance was an essential function of the position with the analytically distinct question of whether the position itself was essential. Hill cites no authority for the proposition that an employer is forbidden from insisting on regular attendance simply because a position was previously vacant for a period of time.

Hill's argument based on the absence of security compromises is similarly flawed. The City need not show that Hill's poor attendance compromised the functioning of the organization, only that it precluded her from discharging her "fundamental job duties." 29 C.F.R. § 1630.2(n)(1), (n)(2)(i) (a "function may be essential because the reason the position exists is to perform that function").

Finally, Hill's reliance on *Humphrey* is misplaced. Hill provides no evidence that a police sergeant could effectively perform all of her work from home. Nor has she provided evidence that other sergeants were allowed to work from home. No reasonable jury could conclude that Hill's is one of the "unusual case[s]" governed by *Humphrey*. *Samper*, 675 F.3d at 1239.[5]

Having concluded that regular and reliable attendance was an essential function of Hill's position, the Court must determine whether, at the time of her termination, Hill was able to maintain such attendance, with or without reasonable accommodation. The City argues that Hill was not able to do so. It points to Hill's attendance record between February 27 and July 27, 2012, noting that during this period of 108 working days she was absent 46 days and partially absent another nine. Doc. 75 at 5 (citing Doc. 68, ¶¶ 223-24). It also cites statements from Hill's doctors in June 2012 indicating that she was not healthy enough to maintain regular and reliable attendance. *See* Doc. 68, Ex. 35 at 3 (June 6, 2012 statement of Dr. Anthony, indicating that Hill was able to work her regular shift only "when feeling well"); *id.* at 10 (June 10, 2012 statement of Dr. Carson,

---

[5] The fact that Hill never requested permission to work from home further undermines her reliance on *Humphrey*. If Hill believed she could effectively work from home, it is hard to understand why she did not suggest the idea upon being notified that she would be discharged if she did not return to work.

- 10 -

answering "no" when asked whether Hill could maintain regular and reliable attendance at her job).

Hill does not dispute the accuracy of the attendance record supplied by the City (*see* Doc. 70, ¶¶ 223-24) or deny that one of her doctors found her unable to work and placed her on an indeterminate leave of absence shortly before her termination (*see* Doc. 69 at 11). Hill instead contends that she was entitled to an indeterminate leave as a reasonable accommodation, and that such leave might have made it possible for her to maintain regular and reliable attendance upon return. *Id.* at 10-11. She cites *Humphrey* for the proposition that "[a] leave of absence for medical treatment may be a reasonable accommodation" in certain circumstances. 239 F.3d at 1135 (citation omitted).

The City counters that *Humphrey* is distinguishable because the employee in that case was requesting her first leave of absence, whereas Hill had just returned from 21 months of leave. Doc. 75 at 9. In addition, the City urges the Court to follow *Robert v. Board of County Commissioners*, 691 F.3d 1211 (10th Cir. 2012), which holds that a leave of absence is only a reasonable accommodation if the employee (1) provides "an estimated date when she can resume her essential duties," and (2) demonstrates that she will be able to discharge the essential functions of her position "in the near future." *Id.* at 1218. Finally, the City contends that it never had the opportunity to consider granting a leave of absence because Hill never requested this relief, despite being advised of the opportunity to do so. Doc. 75 at 9; *see* Doc. 68, Ex. 8.

Hill is correct that an employer may be required to grant a leave of absence as a reasonable accommodation to a qualified individual with a disability. Generally, "[t]he ADA does not require an employee to show that a leave of absence is certain or even likely to be successful to prove that it is a reasonable accommodation"; it is sufficient if the employee shows that it is *plausible* that she would be able to discharge her essential functions upon return. *Humphrey*, 239 F.3d at 1136. Where the employee has previously availed herself of medical leave, however, the standard may be more demanding. *See id.* n.13 ("[T]he fact that a prior leave was granted and was unsuccessful may be a relevant

1    consideration in determining whether additional leave would be a reasonable
2    accommodation."). The Court concludes that because Hill's attendance problems began
3    within months of her return from a 21-month period of medical leave, she was not
4    entitled to additional leave as a reasonable accommodation unless she demonstrated
5    something more than a mere plausibility that additional leave time would resolve the
6    health issues causing her attendance problems.

7    But even if plausibility is the appropriate standard, Hill did not give the City any
8    reason to believe that additional leave time would resolve her health issues. She did not
9    provide the City with any evidence that her doctors had a plan for getting her symptoms
10   under control or an estimated date when she would be able to return to work. In fact, one
11   of Hill's doctors indicated shortly before her termination that it was "difficult [to]
12   pinpoint when she will be able to return to duty, if ever." Doc. 68, Ex. 21 (June 4, 2012
13   letter from Dr. Carson); *id.*, Ex. 32 (July 25, 2012 letter with identical wording). Another
14   doctor agreed that it was "difficult to say exactly when Ms. Hill can return to work,"
15   although he expected that it might be possible once her stress levels improved. *Id.*, Ex.
16   22 (June 6, 2012 letter from Dr. Anthony). None of the letters the City received from
17   Hill's doctors in the months before her termination included information about Hill's
18   course of treatment or anticipated return date. *See id.*, Exs. 21, 22, 26, 28-30, 32. Absent
19   any information about the course of treatment Hill would pursue if granted leave, or
20   when her condition might improve, the City was not required to provide Hill with
21   additional leave as a reasonable accommodation. *See Roberts*, 691 F.3d at 1218 (medical
22   leave is not a reasonable accommodation unless employee provides "an estimated date
23   when she can resume her essential duties"); *cf. Samper*, 675 F.3d at 1240 ("An
24   accommodation that would allow [an employee] to simply miss work whenever she felt
25   she needed to and apparently for so long as she felt she needed to . . . is not reasonable on
26   its face") (citation and internal formatting omitted).

27   Because Hill was not entitled to a leave of absence, she can prevail only if she
28   shows that some other reasonable accommodation would have made it possible for her to

maintain regular and reliable attendance at the time of her termination. Hill's own statements preclude any such finding. In her August 7, 2012 letter to the City, Hill offered the following explanation for her failure to report to work on July 27, 2012: "I was absent from my job only because I was instructed not to work by my doctors. If I were able to perform my job, I would be there and I'm certain the City does not want me at work if I'm unable to perform my duties." Doc. 68, Ex. 33. Hill asked to be reinstated and allowed to remain on unpaid leave until she could complete her LTD application, but did not indicate that there were any accommodations that would allow her to return to work. *Id.* The statements of Hill's doctors likewise preclude a finding that she was able to maintain regular and reliable attendance with or without reasonable accommodation at the time of her termination. *See* Doc. 68, Ex. 35 at 10 (June 10, 2012 statement of Carson, answering "no" when asked whether Hill could maintain regular and reliable attendance). Because the undisputed evidence establishes that Hill was unable to maintain acceptable attendance at the time of her termination, the City is entitled to summary judgment on this claim.[6]

### B.     Interactive Process.

Hill also asserts that the City violated the ADA by failing to engage in the interactive process in good faith. Doc. 69 at 11-13. The interactive process is an informal undertaking in which the employee and the employer attempt to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). There are four critical steps in the process: (1) identifying the essential functions of the employee's position, (2) identifying the employee's precise limitations, (3) identifying potential accommodations and assessing the effectiveness of each, and (4) implementing the accommodation that is "most appropriate for both the employee and the employer." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (citing 29 C.F.R. Pt. 1630,

---

[6] Because the Court concludes that Hill was not a qualified individual with a disability at the time of her termination, it need not reach the question of whether she was discharged because of her disability.

- 13 -

1   App. § 1630.9), *vacated on other grounds by U.S. Airways, Inc. v. Barnett*, 535 U.S. 391
2   (2002).  An employer must participate in the interactive process upon receiving notice of
3   the employee's disability and desire for accommodation, or, "[i]n circumstances in which
4   an employee is unable to make such a request, if the company knows of the existence of
5   the employee's disability."  *Barnett*, 228 F.3d at 1114.  An employer's duty to engage in
6   the process continues as long as "the employer is aware that the initial accommodation is
7   failing and further accommodation is needed."  *Humphrey*, 239 F.3d at 1138.

8   "Employers who fail to engage in the interactive process in good faith face
9   liability for the remedies imposed by the statute if a reasonable accommodation would
10  have been possible."  *Id.* at 1137-38 (citing *Barnett*, 228 F.3d at 1116).  An employer is
11  not subject to liability on this theory, however, if the employee was responsible for the
12  breakdown in the process.  *Barnett*, 228 F.3d at 1115; *see also Allen v. Pac. Bell*, 348
13  F.3d 1113, 1116 (9th Cir. 2003).

14  In determining whether a reasonable accommodation would have been possible,
15  the Court considers the accommodations that were possible at the time the interactive
16  process broke down.  Thus, it is not dispositive that Hill was not a qualified individual
17  with a disability – i.e., an individual able to perform the essential functions of her job
18  with or without reasonable accommodation – when her employment relationship with the
19  City ended in late July 2012.  The relevant question is whether she was such an
20  individual at the time of the City's alleged failure to participate in May and June 2012.  A
21  reasonable jury could find that she was qualified at that time.  While it is true that Hill
22  was having trouble maintaining regular and reliable attendance in May and June, a
23  reasonable jury could conclude that she was not fully accommodated at that time, and
24  that she could have maintained adequate attendance if she had been granted additional
25  accommodations (e.g., a transfer to a fully sedentary position, a 4/10 schedule) to assist
26  with the management of her disabilities.

27  The Court must determine whether, as a matter of undisputed evidence, it is
28  possible to assign blame for the breakdown in the interactive process.  Each party

contends the other caused the breakdown. Docs. 68 at 18-19; 69 at 11-13. The City argues that it sought to accommodate Hill's disabilities in several ways. It assigned Hill to the Front Desk Sergeant position, which it believed to be sedentary, and gave her a shift consistent with Dr. Anthony's orders. Doc. 67 at 3. The City allowed Hill to flex her time in late March and April and to take several days off in May, and scheduled an appointment for her to meet with its Equal Opportunity Department when it became clear she might need additional accommodations. *Id.* at 3, 18. Finally, the City provided Hill with a reasonable accommodation questionnaire to help identify additional accommodations. *Id.* at 18. The City argues that these efforts establish its good faith, and that the interactive process broke down because Hill did not attend the appointment with the Equal Opportunity Department or return the reasonable accommodation questionnaire. *Id.*

Hill avers that she did not know about the Equal Opportunity Department meeting until after it occurred, and that she did return the questionnaire. Thus, the Court cannot conclude as a matter of undisputed fact that Hill was responsible for the breakdown in the interactive process. Although it is undisputed that Hill did not resubmit the questionnaire after being informed on July 19, 2012 that the City had not received it (Docs. 68 & 70, ¶¶ 212, 217), the Court cannot conclude that Hill's failure to resubmit this form – which she believed was already in the City's hands – establishes as a matter of law that she was responsible for the breakdown.

Nor do the City's various efforts to accommodate Hill entitle it to summary judgment. The City was bound to continue exploring possible accommodations as long as it was "aware that the initial accommodation [wa]s failing and further accommodation [wa]s needed." *Humphrey*, 239 F.3d at 1138. This duty first attached in mid-April, when Hill informed Mary Lynne MeKenney that she was still experiencing work-related ankle problems, and it continued until her termination in late July. A reasonable jury could conclude that the City engaged in certain acts of obstruction or delay during this period that made it impossible to implement reasonable accommodations that would have

1 allowed Hill to discharge her essential functions.  For example, there is evidence in the
2 record that (1) Judy Boros did not respond to Hill after Hill tried to contact her about
3 additional accommodations, (2) the City removed Hill from Off Duty Detail over her
4 objection that such removal would be "punishment," (3) the City denied Hill's request to
5 work 4/10s so that she could attend doctors' appointments during the week, and (4) the
6 City never contacted Hill's doctors, despite the fact that both Dr. Anthony and Dr.
7 Carlson offered to answer any questions the City might have about Hill's condition.  This
8 evidence creates a question of fact about whether the City was responsible for the
9 breakdown in the interactive process.  The City is not entitled to summary judgment.

10      Hill is not entitled to summary judgment because there is a genuine dispute of
11 material fact as to whether a reasonable accommodation would have been possible but for
12 the breakdown in the interactive process.  In addition, a reasonable jury could choose not
13 to credit key aspects of Hill's testimony.  For example, a reasonable jury could disbelieve
14 Hill's testimony that (1) the Front-Desk Sergeant position was not truly sedentary,
15 (2) Hill communicated concerns about being on her feet too much to Lopez, (3) Hill
16 never received Lopez's text message about the Equal Opportunity Department meeting,
17 and (4) Hill returned the reasonable accommodation questionnaire to the City.  Questions
18 of fact preclude summary judgment for Hill.

19 **IV.   Conclusion.**

20      In this litigation, Hill has presented two theories of relief.  Her first theory asserted
21 that the City violated the ADA in July 2012 by terminating her instead of granting her a
22 leave of absence.  Her second theory asserted that the City violated the ADA by failing to
23 engage in the interactive process in good faith during May and June of 2012 when it
24 became clear that her condition was deteriorating.  Both theories alleged that the City
25 failed to accommodate Hill's disabilities, but each focused on a different point in time
26 and different approaches to accommodation.

27      The Court has accepted Hill's framing of the case, and concludes that it is
28 appropriate to treat the theories differently.  The undisputed facts in this case – including

Hill's own statements and the statements of her doctors – indicate that Hill was not able to perform the essential functions of her job in or after July 2012, and that no reasonable accommodation would have changed this fact. For this reason, the Court must grant summary judgment to the City on Hill's unlawful termination claim. *See Samper*, 675 F.3d 1233.

By contrast, it is not possible to determine as a matter of undisputed fact whether Hill's condition might have stabilized, allowing her to perform the essential functions of her job going forward, had the City engaged fully in the interactive process in May and June 2012 – a process that might have led to helpful accommodations. It is similarly impossible to determine as a matter of undisputed fact whether the City engaged in the interactive process in good faith during this time.

The Court's ruling precludes Hill from arguing at trial that the City's failure to grant an additional period of leave in July 2012 was a violation of the ADA. But she is not precluded from arguing that the City violated the ADA by failing to engage in good faith in the interactive process, or from arguing that such a process would have led to job-saving accommodations. And she is eligible for any form of relief that the ADA makes available to a person who prevails on a failure to accommodate claim. *Humphrey*, 239 F.3d at 1138 (citing *Barnett*, 228 F.3d at 1116)**.**

**IT IS ORDERED:**

1. Plaintiff's motion for summary judgment (Doc. 69) is **denied.**
2. Defendants' motion for summary judgment (Doc. 67) is **granted** with respect to Hill's unlawful termination claim, but otherwise **denied**.
3. A telephonic hearing is set for **February 17, 2016 at 3:00 p.m.** before the Honorable David G. Campbell, 401 West Washington Street, Courtroom 603, Phoenix, Arizona 85003. Counsel for Plaintiff shall initiate a conference call to include counsel for Defendants and the Court. If a dial-in number is used, the dial-in information shall be provided to the Court and counsel no later than February 16, 2016 at 5:00 p.m. Counsel shall be

prepared to discuss the length of time sought for trial of this matter and proposed trial dates. The Court will set a final pretrial hearing date and **firm** trial date at this hearing.

Dated this 8th day of February, 2016.

_____
David G. Campbell
United States District Judge